UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

SEAN A. RIKER,

              Petitioner,

                                Case No. 16-cv-446-pp

   v.

GARY BOUGHTON,

              Respondent.

---

**ORDER DENYING PETITION FOR WRIT OF *HABEAS CORPUS* UNDER 28 U.S.C. §2254 (DKT. NO. 1), DISMISSING CASE AND DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY**

---

In November 2011, a Racine County jury convicted the petitioner of sixteen charges related to the physical and sexual abuse of his then-wife and two stepdaughters, CJ and KS. Dkt. No. 1. This *habeas* petition alleges that the state presented insufficient evidence to convict him of nine of the sixteen charges and that the court imposed an excessive sentence in violation of the Eighth Amendment. Id. The Wisconsin Court of Appeals did not unreasonably apply the law in finding that the state presented sufficient evidence to convict the petitioner. The court will dismiss the petition and decline to issue a certificate of appealability.

I.      **BACKGROUND**

    A.    <u>Underlying Case</u>

At about 10:45 a.m. on November 10, 2009, Tayler Riker came to the Racine County Sheriff's Department with her four children—CJ, KS, KR and

SR—to file an assault complaint. Dkt. No. 29-1 at 148-149. She was, according to the officer who assisted her, upset, shaking, crying and injured. Id. at 151. The officer took photos of the injuries. Id. At trial, Tayler testified that in November 2009, she, the petitioner and the children had moved to Wisconsin. Dkt. No. 29-3 at 66. She testified that after she married the petitioner, he had begun to abuse the children, and that it escalated as the relationship went on. Id. at 73. She described various incidents of physical injury and sexual abuse over the years before the family moved to Wisconsin. Id. at 67-81. She told the jury that once they arrived in Wisconsin, the petitioner became more stressed and agitated, and that he abused her and the children. Id. at 86-97. She described an incident that occurred on November 5, 2009, when the family arrived home from shopping to find that one of the children had locked the keys in the house, and how the petitioner reacted by physically abusing her and the children. Id. at 87-97. These events included an incident where the petitioner made CJ suck up a urine stain with her mouth. Id. at 97-98. She described another incident several days later, where the petitioner sexually abused CJ, and hit her, while driving. Id. at 98-100. She described an incident on November 9, 2009 where the petitioner broke a broom and threatened her with the stick, and where the petitioner threatened to kill her. Id. at 100-105. She also described an incident where the petitioner held a gun to several family members' heads. Id. at 107-110.

Later on November 10, 2009, police apprehended the petitioner at the family's residence. Id. at 177-181.

Racine County charged the petitioner in a sixteen-count criminal complaint. State of Wisconsin v. Sean A. Riker, Case Number 2009CF001490, Racine County Circuit Court, available at wcca.wicourts.gov (last visited Nov. 12, 2019). The complaint alleged three counts of first-degree recklessly endangering safety, one count of possession of firearm by a felon, one count of battery, one count of strangulation and suffocation, five counts of child abuse, two counts of causing mental harm to a child, one count of repeated sexual assault of the same child, one count of sexual contact with person under the age of thirteen and one count of possessing a short-barreled shotgun/rifle. Id. The jury trial took place in November of 2011.

  1. *Trial*

The state presented evidence from Racine County Sheriff's Department investigators, including detective James Muller, who took the intake interview with Tayler Riker. Dkt. No. 29-1 at 151. The jury saw photographs of Tayler's bruises and black eye from November 10, 2009. Id. The jury watched video interviews of KS and CJ from the day they reported to the Sheriff's Department and from a month after reporting the allegations. See Dkt. No. 29-1 at 165-66 (November interview of KS); Dkt. No. 29-2 at 4 (December interview of KS); Dkt. No. 29-2 at 55 (November interview of CJ); Dkt. No. 29-2 at 55-56 (December interview of CJ). The jury heard in-person testimony from KS and CJ. Dkt. No. 29-2 at 11-97. KS testified about an incident where, after being locked out of the house, the petitioner blamed KS and "smashed [her] against the door." Dkt. No. 29-2 at 16. She testified about a time the petitioner "was putting his hand

on [CJ]'s leg and like rubbing against it, and she told him not to and he got really mad and smacked—um hit her[.]" <u>Id.</u> at 17. She testified that she saw the petitioner with a gun and that he put the gun to everyone's head. <u>Id.</u> at 17. She testified that there was a time that CJ wet the bed and that the petitioner made CJ suck half of it up with her mouth. <u>Id.</u> at 18-19.

CJ testified that she lived with the petitioner for three years and did not like living with him. <u>Id.</u> at 59. She testified that "[the petitioner] would make me sleep with him at night. He would make me take a shower with him. He would always touch me." <u>Id.</u> at 60. She testified that the petitioner showed her his penis; "he would walk around the house naked always wave it in my face and tell me to put it in my mouth." <u>Id.</u> at 61. She testified about an "incident that happened on the futon in Wisconsin" where she "had an accident and [the petitioner] made me suck it up with my mouth." <u>Id.</u> She testified that she witnessed the petitioner putting a "sawed-off shotgun" to KS's and Tayler Riker's head. <u>Id.</u>

The jury heard from Rita Kadamian, a nurse practitioner who physically examined CJ and KS on November 10, 2009. Dkt. No. 29-3 at 7-8. She testified that both girls had normal physical and sexual exams (with the exception of one bruise on CJ's back consistent with kicking), but that 95% of all child victims present with normal exams. <u>Id.</u> at 9-11. The jury heard from Dr. Melissa Westendorf, a clinical and forensic psychologist who conducted interviews with both girls in December of 2009. <u>Id.</u> at 22. She testified that she

found the girls to have anxiety, excessive worry, symptoms of anxiety (such as bed wetting) and symptoms of depression. Id. at 24.

The jury heard from Tayler Riker, who explained that in the week the family had been in Wisconsin, things escalated beyond their normal level. Id. at 86. She testified that after the family got locked out of their house on November 5, 2009, the petitioner got angry and "slammed [KS's] head against the door and he called her a bitch." Id. She stated the petitioner proceeded to beat and choke her (Tayler) as well. Id. She testified that she bled from this beating and hid her bloody shirt under the sink. Id. at 92. The state presented the shirt as well as a picture of where law enforcement found the shirt—under the vanity. Id. Tayler also testified about an incident on November 7, 2009, where she saw the petitioner "play wrestling" with CJ and "feeling her up." Id. at 94. She said that when CJ asked him to stop, and "knuckled him" on the top of his head, the petitioner got angry and began punching CJ in the head. She testified that before CJ could run out of the room, CJ urinated on the futon. Id. at 96. Tayler said that when the petitioner discovered the urine on the futon, he "told [CJ] to suck it up with her mouth." Id. at 97.

Tayler testified about an incident that occurred while driving; she said that while CJ was seated in the front passenger seat, Tayler saw the petitioner "tr[ying] to caress the inner part of [CJ's] left leg." Id. at 99. CJ told him to stop and eventually climbed into the back seat with the rest of the family. Id. at 99-100. The next day, Tayler testified that the petitioner became upset about the house being messy and threatened Tayler: "if shits not different tomorrow

that's it." Id. at 102. She testified that she feared he would kill her. Id. As part of this tirade, Tayler stated the petitioner broke the TV and VCR. Id. at 103.

Finally, Tayler testified that her husband brought a gun to Wisconsin from Utah. Id. at 107. When shown a picture of the gun eventually recovered from the residence, she stated her belief that it was a shotgun and that she would not know the difference between a shotgun and rifle. Id. at 107-108. She described an incident where the petitioner pointed the gun at the back of her head, the back of KS's head, and the back of her son SR's head. Id. at 108-09. She testified that she heard him pull the trigger while the gun was behind KS's head. Id. at 110. She testified that she was certain the gun was not loaded, but went to the police because of the petitioner's access to the gun, because things were escalating and because she "really believed [the petitioner] would kill me." Id. at 111.

The jury also heard from Peter Zurawski, who moved into the Riker family's residence after Tayler moved out and found a gun lodged behind the furnace. Id. at 171. Deputy Sheriffs testified about making phone contact with the petitioner on the day of his arrest and about following up with Zurawski as to where he found the gun. Id. at 180-188. The jury heard from the investigator who located the petitioner at his residence using the petitioner's cell phone signals. Id. at 192. The same investigator testified about executing a search warrant of the residence and finding a bloody blue shirt, a broken TV and a broken VCR. Id. at 194-97. He testified that they did not find a gun, despite an extensive search. Id. at 198. The jury heard from Nicholas Homa, a forensic

scientist with the Milwaukee Crime Lab, who testified that swabs taken from the blue shirt indicated that it was Tayler Riker's blood. Dkt. No. 29-4 at 3-4. Last, investigator Muller testified upon re-call that he performed an e-trace of the gun, which revealed its original owner to reside in Utah. Id. at 17.

Before presenting witnesses, the petitioner moved to dismiss all counts. Dkt. No. 29-4 at 25. His counsel focused particularly on the "causing mental harm to a child" counts, contending that "there's been no proof whatsoever of any evidence showing that my client caused mental harm to these children in Wisconsin." Id. at 25. More generally, he argued that the witnesses' testimony was "all over the map in all days, times and locations. Specific locations however as to what happened in Wisconsin are woefully lacking." Id. at 26. The trial court reserved ruling. Id. at 29.

The petitioner presented testimony from Dr. Thomas Schacht, a professor of psychiatry and behavioral science at the College of Medicine at East Tennessee State University Id. at 32. Dr. Schacht reviewed the video interviews of the child victims and offered various criticisms of the interviewers' techniques; for example, the interviewers did not (but, Schacht asserted, should have) explored the alternative hypothesis that the mother had coached her children. Id. at 49-50. Dr. Michael Kula, a clinical psychologist, also testified for the defense. Id. at 104. He offered criticisms of the interviewing techniques and testified that based on his review of the videotapes, KS "did not experience the any [sic] type of significant emotional affect or stress that would be diagnosable such as a major depressive disorder or generalized anxiety

disorder." Id. at 122. He further opined that he did not believe the petitioner caused either daughter any significant or substantial harm. Id. at 130.

The petitioner did not testify. Id. at 154. In cross-examination and closing argument, the petitioner's counsel argued that Tayler Riker was on a mission to get rid of her husband and had coordinated the children's reports of abuse. Dkt. No. 29-5 at 45. Through Tayler, the petitioner introduced almost forty photos and several home videos taken during the trip to Wisconsin and in Wisconsin; he argued that none of these photos or videos showed the children as being unhappy or revealed evidence of abuse. Dkt. No. 29-3 at 149-50. He argued that the children's testimony had been inconsistent—that it would be impossible for the jury to conclude beyond a reasonable doubt that all these incidents happened in Wisconsin (as opposed to Utah). Dkt. No. 29-5 at 54-57. He argued that although the child victims regularly attended school, none of their teachers or other school employees had ever reported suspicious injuries or misbehavior. Id. at 53. He also argued that had the abuse been as severe as the victims claimed, there would have to have been physical evidence to corroborate that testimony; because none existed, he argued, the jury could not (and should not) believe the victims. Id. at 57.

The jury returned guilty verdicts on all sixteen counts. Dkt. No. 29-5 at 122-25.

2. *Sentencing*

The petitioner chose not to attend his sentencing. Dkt. No. 29-6. His attorney reported that upon the attorney's arrival at the petitioner's place of

custody, he'd asked a guard to call the petitioner; the petitioner had responded by thanking counsel for coming, but indicating that he "wasn't interested in being with [counsel] or participating in this sentencing." Id. at 2. Counsel indicated that the petitioner had relayed that message twice. Id.

The sentencing judge (a different judge from the one who presided over the trial) sentenced the defendant to ten years of initial confinement on Count One; fifteen years of initial confinement on Count Two; fifteen years of initial confinement on Count Three; five years of initial confinement on Count Four; one year of initial confinement on Count Five; seven years of initial confinement on Count Six; seven years of initial confinement on Count Seven; seven years of initial confinement on Count Eight; seven years of initial confinement on Count Nine; seven years of initial confinement on Count Ten; seven years of initial confinement on Count Eleven; thirteen and a half years of initial confinement on Count Twelve; thirteen and a half years of initial confinement on Count Thirteen; forty years of initial confinement on Count Fourteen; forty years of initial confinement on Count Fifteen; and five years of initial confinement on Count Sixteen. Dkt. No. 29-6 at 62-66. He ordered these sentences to run consecutively, for a cumulative term of two hundred years of initial confinement. Id. The periods of supervised release attached to each of the periods of initial confinement totaled sixty-nine years. Id.

3.      *Appeal*

　　　i.      Petitioner's Appellate Arguments

The petitioner appealed. <u>See</u> Dkt. No. 15-4. He argued that the state presented insufficient evidence to convict him on all three of the first-degree recklessly endangering safety counts, two of the five physical abuse of a child counts, both causing mental harm to a child counts, the repeated sexual assault of a child count and the sexual assault of a child under thirteen count. Dkt. No. 15-4 at 2. He argued that if the court vacated some of his convictions, he was entitled to sentencing on the remaining counts. <u>Id.</u>

For the recklessly endangering safety counts, the petitioner argued that trial testimony showed that "the gun was not loaded—and everyone, including Riker—knew it. This fact shows that his conduct did not create a risk of death or great bodily harm or evince utter disregard for human life." <u>Id.</u> at 17. For two of the physical abuse of a child convictions, the petitioner argued that the state had not presented evidence of pain or injury. <u>Id.</u> at 21. For the causing mental harm to a child convictions, the petitioner argued that Dr. Westendorf "could not say to a reasonable degree of certainty that [the petitioner] caused the harm" and that defense expert Dr. Kula testified that "the testing produced scores that were in the subclinical range and did not reveal major depression or generalized anxiety disorders." <u>Id.</u> at 24. For the repeated acts of sexual assault charge, the petitioner argued that CJ testified she slept with the petitioner voluntarily and CJ's description of their sleeping style (with the petitioner's front facing CJ's back and his hand on her stomach) "failed to meet

the jury instruction that required contact with her vagina." Id. at 26. He also argued that CJ said the petitioner used a bar of soap to touch her—not his hand or fingers. Id. Finally, as to the sexual assault of KS, the petitioner contended the state never established that it happened in Wisconsin during the first week of November 2009. Id. at 28-29.

ii.     Court of Appeals Decision

On January 28, 2015, the Court of Appeals affirmed the district court. Dkt. No. 15-2. It observed that a jury verdict could be reversed for insufficient evidence only where "the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." Id. at 2 (quoting State v. Poellinger, 153 Wis.3d 493, 501 (1990)).

Regarding the petitioner's challenge to the reckless endangerment counts, the court observed that a firearm was considered a dangerous weapon even if it was unloaded. Id. at 3 (citing Wis. Stat. §939.22(10)). The court surveyed the trial testimony and concluded that "the jury reasonably could have concluded that this escalation of established abuse—saying he would kill them all, holding a gun to their heads, and pulling the trigger—posed an unreasonable and substantial risk of death or great bodily harm and evinced utter disregard for their lives." Id. at 4. It had "no trouble" affirming these convictions. Id.

Regarding the physical abuse of a child counts, the court noted KS's testimony that the petitioner "slammed" her head against the door, causing her to get a "big bump." Id. at 5. It observed that the statutory definition of physical abuse required proof of physical pain or injury, illness or any impairment of physical condition; it did not require severe harm necessitating medical treatment. Id. (citing Wis. Stat. §939.22(4); Wis JI-Criminal 2109). Regarding the hand-on-CJ's leg incident, the court of appeals quoted CJ's testimony that when "she continued to try and push it away and say no he began punching her leg." Id. at 6. It remarked "the jury reasonably could have inferred from the testimony that nine-year-old C.J. felt physical pain when a 'really mad' [petitioner] 'smacked' or 'hit' or 'punched' her in the face and on her leg. This satisfied the element of bodily harm." Id. at 6.

Regarding the mental harm to a child counts, the appellate court observed that although Dr. Westendorf opined that CJ and KS's signs of anxiety, depression, and post-traumatic stress disorder "stemmed from before they moved here," the jury also heard testimony that the petitioner's outbursts increased to "every single day" in Wisconsin and "were getting more extreme." Id. at 6-7. The appellate court cited the petitioner's destruction of KS's school materials and forcing CJ to suck up urine with her mouth as evidence that allowed the jury "to conclude that [the petitioner] caused the girls additional mental harm in Wisconsin." Id. at 6-7.

Regarding the sexual assault counts, the court relied on CJ's testimony that the petitioner would walk around the house naked, wave his penis in her

face and tell her to put it in her mouth. Id. at 7. It wrote "that sexualized conduct provided sufficient evidence from which the jury reasonably could have found that even if he used a bar of soap to touch her vagina in the shower, he did it for purposes of his sexual gratification." Id. As for the count related to KS, the court rejected the petitioner's argument that KS had not been specific on time-frame. Id. at 8. It concluded that "the jury could have believed K.S.'s testimony about the sexual assault in Wisconsin without believing that it occurred in the summer." Id. Having rejected each of his arguments, the court affirmed the convictions. Id.

The Wisconsin Supreme Court declined review of the petitioner's case on May 11, 2015. Dkt. No. 15-3.

B.     Federal *Habeas* Petition

1.     *Procedural History*

On April 11, 2016, the petitioner filed in this court a petition for writ of *habeas corpus* under 28 U.S.C. §2254. Dkt. No. 1. The petition challenged his convictions on grounds that the state had presented insufficient evidence to convict him, the sentencing judge had imposed an excessive sentence, his trial and appellate counsel had performed ineffectively and the trial court erroneously admitted other acts evidence. Id.

This court screened the petition on May 27, 2016. Dkt. No. 8. The screening order observed that the petitioner had presented only two of those claims to all levels of the Wisconsin courts: insufficiency of the evidence and excessive sentence. Id. at 2. As for his other claims—ineffective assistance of

trial counsel, ineffective assistance of appellate counsel, and the allegedly erroneous admission of other acts evidence—the court remarked that the petitioner had presented those claims only to the trial court in a post-conviction motion under Wis. Stat. §974.06. <u>Id.</u> at 2-3. The court concluded that the petitioner had presented a "mixed" *habeas* petition and that he must decide whether to dismiss the unexhausted claims or ask the court for a stay while he exhausted those claims in state court. <u>Id.</u> at 3-4. The screening order also declined to issue subpoenas for the petitioner. <u>Id.</u> at 4-5.

The petitioner filed a response on May 31, 2016; he told the court he would drop the unexhausted claims and continue with the two exhausted claims. Dkt. No. 9 at 1. He also made a second request for discovery, telling the court that prison staff had confiscated pages from his discovery file and that he needed the respondent to re-send discovery. <u>Id.</u> at 3. Less than a month later, the petitioner filed a motion to compel. Dkt. No. 10. The motion asked the court to compel prison staff to release court documents that had been confiscated from the petitioner's cell. <u>Id.</u>

The court issued a second order on June 30, 2016. Dkt. No. 11. That order acknowledged the petitioner's request to withdraw his unexhausted claims and proceed only on his exhausted claims—insufficiency of the evidence and excessive sentence. <u>Id.</u> at 2. The court cautioned, however, "nothing in this order prevents the respondent from arguing that the petitioner has not exhausted his claims or has procedurally default one or both of his claims, or from filing pleadings based on either such argument." <u>Id.</u> The court also

reviewed the petitioner's renewed discovery demands, denying the motion to compel as premature because the respondent had not yet answered the petition and had not yet filed the materials described in Rule 5 of the Rules Governing §2254 Proceedings. Id. at 3.

After the Wisconsin Department of Justice accepted service and filed a notice of appearance, dkt. no. 13, the petitioner filed a motion to appoint counsel, dkt. no. 14. A month later, the court denied the motion without prejudice. Dkt. No. 16. The court wrote that at that time, the petitioner had not shown his case to be too complex for him to represent himself. Id.

On August 22, 2016, the respondent filed a response to the petition. Dkt. No. 15. The respondent agreed that the petitioner had exhausted all available state court remedies with respect to the sufficiency of the evidence on nine of the sixteen charged offenses. Id. at 2. He asserted, however, that the petitioner had not raised the "excessive sentence" issue on direct state court review. Id. The respondent filed multiple relevant attachments, but withheld transcripts from the petitioner's jury trial, stating that they would be filed "once [the petitioner] dismissed out his unexhausted claims and declares that he will proceed only on the sufficiency of the evidence challenge to nine of the sixteen convictions that he properly exhausted in state court." Id. at 5.

Three days later, the petitioner responded. Dkt. No. 17. He "agree[d] he did not exhaust the sufficiency of evidence to convict him on the other seven counts." Id. He also "agree[d] that his petition is 'mixed' BUT will fix it within

this response by unmixing it and dropping the seven unexhausted claims." <u>Id.</u> at 2.

On October 17, 2016, the respondent filed two supplements to his answer. Dkt. Nos. 29, 30. The supplements included transcripts from the petitioner's trial and sentencing hearing as well as transcripts from interviews with CJ and KS. <u>Id.</u> The respondent filed his brief in opposition three days later. Dkt. No. 31.

The petitioner filed a reply brief on October 26, 2016 and attached various exhibits, including three DVDs. <u>See</u> Dkt. Nos. 33-34. Together with the DVDs, the petitioner filed a motion asking the court to return the DVDs to him, because they were originals and not copies. Dkt. No. 35. On March 23, 2017, the court issued an order on the petitioner's discovery requests and granted his request for return of DVDs. Dkt. No. 38. The court issued a subsequent order on December 18, 2017, resolving the last of the petitioner's requests for return of his confiscated legal work. Dkt. No. 42. Since the court's December 2017 order, the petitioner has sent the court seven letters requesting status updates and a ruling on his case. He also notified the court that he filed a petition for writ of *mandamus* in the Seventh Circuit. Dkt. No. 51. The court regrets its delay in addressing the case and now gives the petitioner a long-deserved ruling on his petition.

2.    *Parties' Arguments*

The petitioner did not file a brief in support of his *habeas* petition.

16

i.     Respondent's Brief in Opposition (Dkt. No. 31)

The respondent's brief argued the Wisconsin Court of Appeals did not unreasonably apply <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979) in determining that the jury had sufficient evidence to convict the petitioner on the nine challenged charges. Dkt. No. 31 at 1. He noted that the petitioner's burden is high: "[the petitioner] must convince this Court that no fair-minded jurist could agree with the Wisconsin Court of Appeals' resolution of his sufficiency of the evidence challenge." <u>Id.</u> at 5 (citing <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011)). The respondent argued that this court must give the court of appeals' decision a "'double dose of deference.'" <u>Id.</u> at 7 (citing <u>London v. Clements</u>, 600 F. App'x 462, 466 (7th Cir. 2015)).

The respondent charged the petitioner with ignoring the inculpatory evidence presented at trial, asserting that the petitioner's argument required the court to view the evidence in the light most favorable to the petitioner, rather than to the state and to the convictions. <u>Id.</u> at 7-8. The respondent reviewed each of the challenged convictions, and specified the evidence presented at trial that he argued was sufficient to enable a rational jury to return a guilty verdict. <u>Id.</u> at 9-23. At the end of his brief, the respondent conceded that if the court finds insufficient evidence to support one or more of the petitioner's convictions, the petitioner would be entitled to resentencing. <u>Id.</u> at 23, n.4. But the respondent opposed the petitioner's request for any supplemental discovery, stating that "[the petitioner] is prohibited from adding evidence to the record that was not before the state courts. In challenging the

sufficiency of the evidence relied upon by the jury, [the petitioner] cannot present evidence that was not before the jury." Id. at 24, fn. 5 (citing Cullen v. Pinsholster, 563 U.S. 170, 182 (2011)).

ii. Petitioner's Reply Brief (Dkt. No. 33)

The petitioner's reply brief began by arguing that his attachment at exhibit A showed his "complete innocence." Dkt. No. 33 at 2. He submitted the transcript of the first interview with KS and argued that before the interview "an unknown officer told KS that if petitioner was released from jail petitioner would 'kill' her." Id. at 2. He argued that this gave KS an incentive to lie; he asserted that "every word, every sentence thereafter by KS should be construed as fabrication." Id. at 3. The petitioner argued that the inculpatory evidence was non-existent and claimed the victims overexaggerated the abuse allegations to the point where—if the victims were to be believed—there would have to be physical evidence to corroborate their testimony. Id. at 3.

As for the reckless endangerment counts, the petitioner observed that Tayler Riker originally described the gun as a sawed-off, double-barrel shotgun, a description which differed from the gun eventually found by the subsequent homeowner. Id. at 4. He questioned how law enforcement didn't manage to find the gun in its extensive search of the house on November 10, 2009. Id. He postulated that law enforcement or Tayler planted the gun and asserted that he "ha[d] never seen that gun." Id. at 5. The petitioner stated that the reckless endangerment could not have happened because "there was never a gun in that house prior to Petitioner's arrest" and that "this exonerating evidence

cannot be ignored." Id. at 5. He claimed that it was unreasonable for the court of appeals to conclude a jury could have convicted the petitioner "with the absence of the specifically described gun, and then the jury just accepts the 9mm without explanation." Id. at 5. The petitioner contended that the lack of corroborating evidence of physical abuse together with the empty gun meant that the jury could not have found him guilty of reckless endangerment. Id. at 6.

As for the two counts of physical abuse of a child, the petitioner argued that CJ's interview said the petitioner touched her only down by her knee—not on her "inner thigh." Id. at 6. He asserted that the jury should not have believed Tayler's testimony about the incident because she was in the second row and had her view blocked by the front seats. Id. at 7. He contended that because each witness testified to a different version of events, the jury should have concluded that the incident of him touching CJ on the leg while driving never happened. Id. As for KS, the petitioner pointed out the disparity between his physical size—"220 pounds of solid muscle and alleged to be a raving lunatic in a rage"—and hers—"50 pounds and a petite very fragile and delicate asian child." Id. at 7. He argued that the jury could not have believed KS's testimony about getting her head slammed against the wall because the physical exam days later showed no sign of past or current abuse. Id.

As for the causing mental harm to a child counts, the petitioner emphasized Dr. Westendorf's testimony that she could not determine whether the petitioner or Tayler Riker caused the harm to the children. Id. at 8. The

petitioner argued that Tayler Riker was the one who caused mental harm to the children, as supported by his attached exhibits of Colorado Child Protective Services reports post-dating the petitioner's arrest. Id. He submitted three DVDs which he said contained family videos taken during the November 2009 time period; he alleged that these DVDs show "the petitioner is always happy and trying to make the kids laugh." Id. at 10. He described the contents of each DVD and argued that none of the videos show the kids being afraid of him or him flying into a rage. Id. Next, the petitioner pointed to pages forty-three to forty-seven of the CJ interview transcript which, he argued, showed CJ absolutely denying that the futon/urine incident occurred. Id. at 11. He also pointed to the portion of CJ's interview transcript where she could not describe the petitioner's penis. Id. As before, the petitioner argued the negative inference; he asserted that if he *was* the rampant sexual abuser the state alleged him to be, CJ and KS would have given different answers to the interviewer's questions. Id. at 12.

    As for the repeated-sexual-assault-of-CJ count, the petitioner argued that CJ's testimony established only that the petitioner touched her with a bar of soap. Id. at 13. He asserted that a child molester would not have had the restraint to resist skin-to-skin contact after four years of daily showers. Id. The petitioner contended that CJ's testimony about the petitioner waving his penis in her face and telling her to put it in her mouth was not true; "once again, if the petitioner was so blatant in all of the other allegations, why wouldn't he just put it in her mouth??" Id. at 14.  He argued that it was either all or

nothing and that "the court is well aware that child molesters do not have restraint." Id. He claimed that the jury could not have reached a guilty verdict on sexual assault of CJ because it did not happen. Id.

Finally, regarding the sexual assault of KS, the petitioner argued that KS's testimony about the petitioner sexually assaulting her never came in at trial. Id. at 15. He asserted that Tayler Riker "debunked" KS's testimony. Id. (citing exhibit A, pg. 7). He charged KS with lying, saying she testified that the petitioner touched her private parts while they lived in Colorado and Oregon. Id. at 15. But, the petitioner said, the petitioner never lived in Colorado or Oregon. Id. He called this a "blatant, over-the-top lie." Id. He also submitted a letter written by KS on December 9, 2009, which described the sexual assault as happening a year ago. Id. at 16 (citing exhibit Q). This letter, petitioner said, disproved the Wisconsin sexual assault allegation. Id. at 16.

## II.    Analysis

### A.    Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant *habeas* relief only if the state court decision was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Miller v. Smith, 765 F.3d 754, 759-60 (7th Cir. 2014) (quoting 28 U.S.C. §2254(d)(1), (2)).

Although the petitioner does not identify which provision of 28 U.S.C. §2254(d) supports his claims, only subsection (d)(1) is available to him. The Wisconsin Court of Appeals did not make factual determinations; it rendered legal conclusions concerning the sufficiency of the evidence presented at trial. The petition challenges that conclusion. Accordingly, the court will review the petitioner's *habeas* claim under §2254(d)(1). See Saxon v. Lashbrook, 873 F.3d 982, 987, ("Generally, we review habeas challenges to the sufficiency of the evidence only under §2254(d)(1)"); see also Jones v. Butler, 778 F.3d 575, 581-82 (7th Cir. 2015). Subsection (d)(1) allows a court to issue a writ of *habeas corpus* only where it determines the state courts applied federal law in an "objectively unreasonable" way. Renico v. Lett, 559 U.S. 766, 773 (2010). "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Id. (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)). "The standard under §2254(d) is 'difficult to meet' and 'highly deferential.'" Saxon 873 F.3d at 987 (quoting Cullen, 563 U.S. at 181.

Under §2254(d)(1), the court looks to the established federal law as stated by the Supreme Court. "The applicable Supreme Court precedent regarding the sufficiency of the evidence is well-established: 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt.'" <u>Saxon</u>, 873 F.3d at 987-88 (quoting <u>Jackson</u>, 443 U.S. at 319 (emphasis in <u>Jackson</u>)).

> Thus, habeas reviews of *Jackson* claims are subject to two levels of judicial deference creating a high bar: first, the state appellate court determines whether any rational trier of fact could have found the evidence sufficient; second, a federal court may only overturn the appellate court's finding of sufficient evidence if it was objectively unreasonable.

<u>Id.</u> (citing <u>Coleman v. Johnson</u>, 566 U.S. 650, 651 (2012)).

At the outset of its opinion, the Wisconsin Court of Appeals wrote that it could not reverse a jury's verdict for insufficient evidence "'unless the evidence, viewed most favorably to the state and the conviction, is so insufficient in probative value and force that it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt." Dkt. No. 15-2 at 2 (quoting <u>Poellinger</u>, 153 Wis.2d at 501). The Seventh Circuit has commented that <u>Poellinger</u>'s statement of sufficiency of the evidence review "effectively duplicates the Supreme Court standard for sufficiency challenges, *see Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979)[.]" <u>Adams v. Bertrand</u>, 453 F.3d 428, 432 (7th Cir. 2006). The petitioner does not argue that the Wisconsin Court of Appeals applied the wrong standard; he claims that the court unreasonably applied the standard in his case.

A final note: "[U]nder *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review." <u>Schlup v. Delo</u>, 513 U.S. 298, 330 (1995). A reviewing *habeas* court "cannot choose the evidence it prefers to emphasize or make its own credibility determinations." <u>Ford v.</u>

Ahitow, 104 F.3d 926, 939 (7th Cir. 1997); see also Jones v. Barnett, 215 F.3d 1330 (Table), 1998 WL 778307, at *4 (7th Cir. 1998) ("It is not our province to second-guess credibility determinations made by the finder of fact.")

B.     Application of the Standard to the Court of Appeals Decision

1.     Reckless Endangerment

A court begins its sufficiency-of-the-evidence analysis by looking to the the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324, n.16 ("the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.") Under Wis. Stat. §941.30, a person commits the crime of first-degree recklessly endangering safety when he "recklessly endangers another's safety under circumstances which show utter disregard for human life[.]" The Wisconsin Jury Instructions list three elements for this offense: the petitioner (1) endangered the safety of another human being (2) by criminally reckless conduct that (3) showed utter disregard for human life. See Wis. JI-Criminal 1345.

The Wisconsin Court of Appeals cited these elements and found the trial testimony sufficient to support a guilty verdict. Dkt. No. 15-2 at 3-4. The petitioner now claims that this decision was unreasonable because "there was never a gun in that house prior to the petitioner's arrest" and "commonsense dictates that the found gun is not the alleged gun in question. The petitioner has never seen that gun." Dkt. No. 33 at 5.

The petitioner does not discuss the inculpatory evidence the state presented to the jury. He focuses instead on what he would have told the jury—that he knew for certain the gun wasn't loaded; that he's never seen the gun recovered by the police; that there was never a gun in the Wisconsin home prior to the petitioner's arrest. The jury never heard this evidence because the petitioner invoked his right not to testify. While that is the petitioner's right, he cannot now argue that the evidence was insufficient because it did not include testimony that he chose not to provide. This court may focus only on the evidence that the jury *did* hear and see.

The state elicited evidence from Tayler Riker that the petitioner had brought a gun with him from Utah to Wisconsin. Dkt. No. 29-3 at 107. Tayler testified that the petitioner held the gun to the back of her head, to the back of KS's head, and to the back of SR's head. Id. at 108-09. She testified that she heard the petitioner pull the trigger when the gun was behind KS's head. Id. at 110. KS testified about the petitioner putting the gun to the back of family members' heads and threatening to kill them. Dkt. No. 29-2 at 17, 43-43. CJ testified that she saw the petitioner putting a gun to the back of family members' heads and threatening "to kill all you guys." Dkt. No. 29-2 at 62. The jury heard that an e-trace of the recovered gun revealed that the original owner resided in Utah—which corroborated Tayler's testimony that this was the same gun the petitioner brought from Utah. Dkt. No. 29-4 at 16-17. The petitioner vehemently argues that because the gun found in the home did not match Tayler Riker's original "sawed off double-barrel shotgun" description of the gun,

the jury should not have accepted her testimony as credible. Dkt. No. 33 at 5. Tayler testified, however, that she did not know the difference between a shotgun and a rifle. Dkt. No. 29-3 at 108. And more to the point, this court cannot make credibility determinations at the *habeas* stage.

The petitioner contends—as he contended to the Wisconsin Court of Appeals—that he could not be convicted of reckless endangerment because everyone knew the gun wasn't loaded. Dkt. No. 33 at 5. As the Court of Appeals pointed out, however, Wisconsin considers a firearm to be a dangerous weapon whether it is loaded or not. Dkt. No. 15-2 (citing Wis. Stat. §939.22(10)). The jury heard that the petitioner's outbursts were escalating in Wisconsin; it heard that Tayler believed the petitioner would kill her; it heard that his access to the gun was a factor in Tayler's decision to go to the police; and it heard that KS didn't know the gun wasn't loaded the first time she saw it. Dkt. No. 29-2 at 43 ("The first time he picked it up I was really scared cause I thought there was bullets in it but I figured out there wasn't and I like wasn't scared.").

The petitioner argues that the court should not credit the testimony because the physical exams of the children from shortly after the arrest did not demonstrate the kinds of injuries one might expect from the abuse reported by the children. But the absence of physical evidence of abuse does not equate to an absence of sufficient evidence for any rational jury to convict the petitioner. Putting a gun to someone's head and threatening to kill them may not leave a lasting physical mark, but a rational jury could conclude that the evidence showed that the petitioner put his family in danger and showed utter disregard

for their lives. The jury heard testimony from Tayler Riker, CJ and KS about the petitioner's behavior with a gun and the jury was entitled to give it the weight they felt it deserved. It is not this court's role to second-guess the credibility determinations made by the jury. It is this court's role to examine whether the Wisconsin Court of Appeals made an unreasonable determination as to sufficiency of the evidence. It did not.

2. Physical Abuse of a Child counts

The jury convicted the petitioner on five counts of physical abuse of a child under Wis. Stat. §948.03(2)(b). That statute makes it a crime for any person to "intentionally cause[] bodily harm to a child[.]" The Wisconsin Statutes further define "bodily harm" as "physical pain or injury, illness, or any impairment of physical condition." Wis. Stat. §939.22(4); see also Wis JI-Criminal 2109.

Here (and to the Wisconsin Court of Appeals), the petitioner challenged two of these counts—one related to KS and one related to CJ. The Court of Appeals rejected the petitioner's arguments by observing that the statutory definition of physical abuse required only physical pain, not severe injury requiring medical treatment or hospitalization. Dkt. No. 15-2 at 5. The Court of Appeals focused on the evidence presented to the jury: KS testified that after being locked out of the house, the petitioner pulled KS by the back of her hair, and "like smashed—like smashed me against the door" causing her to get "a big bump." Dkt. No. 29-2 at 32-33. CJ, KS and Tayler Riker all testified about the hand-on-leg incident with CJ in the car. KS and Tayler both testified that

27

the petitioner struck CJ in the leg. Dkt. No. 29-2 at 16-17 (KS: "[petitioner] was putting his hand on [CJ]'s leg and like rubbing against it, and she told him not to and he got really mad and smacked—um, hit her, punched her in the face and told her to get in the back."); Dkt. No. 29-3 at 98-99 (Tayler: "the first time she tried to push his arm away he just pushed it back on her leg. And after she continued to try and push it away and say no he began punching her leg."). On the basis of this testimony, the Court of Appeals concluded that a jury had sufficient evidence to return a guilty verdict on the two challenged counts of child abuse.

To this court, the petitioner insists the jury should not have believed the testimony, particularly because there was no corroborating evidence of physical abuse—neither physical examination nor the photos submitted showed any sign that the girls were physically abused. Dkt. No. 33 at 6. He says that this court also should find KS's testimony wholly incredible because "an unknown Racine County Sheriff's department employee told KS that the petitioner would kill her if he got out of prison." Dkt. No. 33 at 2.

There is no record evidence to support the petitioner's contention that a police officer told KS that the petitioner would kill her if he got out of jail. His brief cites the forensic interview of KS but does not identify any evidence showing that a police officer tried to influence KS, and the court can't find any. The petitioner's other arguments—that any rational jury would find the girls' testimony incredible—ignores the legal requirement that the Wisconsin Court of Appeals was obliged to view the evidence in the light most favorable to the

convictions, with deference to the jury's credibility determinations. The jury itself watched video interview of KS and CJ; the jury itself heard KS and CJ testify and respond to cross-examination by defense counsel about the inconsistencies in their testimony. The jury believed KS, CJ and Tayler Riker. The Wisconsin Court of Appeals did not make an unreasonable determination in finding the testimonial evidence of physical harm sufficient to support these convictions.

<blockquote>3.     Causing Mental Harm to a Child counts</blockquote>

The jury convicted the petitioner on two counts of causing mental harm to a child under Wis. Stat. §948.04(1). That statute provides, "[w]hoever is exercising temporary or permanent control of a child and causes mental harm to that child by conduct which demonstrates substantial disregard for the mental well-being of the child is guilty of a Class F felony." Wis. Stat. §948.04(1).

The Wisconsin Court of Appeals noted that the jury heard from a psychologist who testified about the children's anxiety and signs of depression. It then reviewed the testimony about the petitioner's behavior, writing:

> Tayler testified that [the petitioner's] outbursts increased to "every single day" in Wisconsin and "were getting more extreme." In the short time before he was arrested, he engaged in the lockout, hand-on-the-leg, and trigger-pulling incidents, and sexually assaulted both girls. He destroyed K.S.'s notebooks and school supplies and told her she now would be homeschooled. The jury reasonably could have rejected the notion that Riker was merely exercising legitimate parental authority and instead accepted the evidence that K.S. loved school, perhaps because it was her only zone of safety. Riker also punched C.J. in the stomach for rebuffing his sexual advances, causing her to involuntarily urinate on the futon she was lying on, then made her suck up the urine with her

mouth. The evidence allowed the jury to conclude that Riker caused the girls additional mental harm in Wisconsin.

Dkt. No. 15-2 at 6-7.

The petitioner's reply brief argues that any mental harm suffered by KS or CJ stemmed from Tayler Riker's actions. Dkt. No. 33 at 8. He submits reports from Colorado's child protective services post-dating the petitioner's arrest, and DVDs showing his interactions with his family. Id. at 10-11. He argues that the Colorado reports show that Tayler Riker provided more details about the allegations of Wisconsin abuse to the authorities in Colorado than she provided in Wisconsin, which he asserts demonstrates that "she is a web weaver of lies." Id. at 17. He argues that the DVDs show him interacting in positive ways with the children, and show no evidence of abuse or fear or mental harm. He asserts that the DVDs show that KS and CJ "are sassy, playful, excited and happy," portray him as a "helicopter parent" who constantly tells his wife she is pretty, show him joking with the children and show his wife being happy. Id. at 9-11. He says that the photos show the same thing. Id. at 10.

Again, the petitioner's arguments ignore the inculpatory testimony presented to the jury (as recounted in the Wisconsin Court of Appeals' opinion) and ask the court to view the evidence in the light most favorable to *him*. Perhaps the petitioner could have testified about Tayler Riker's parenting style and bolstered his contention that she was the cause of the harm, but he chose not to do so. Perhaps if the law had required the Court of Appeals to view the evidence in the light most favorable to the *petitioner*, it would have found Tayler

Riker responsible or found the petitioner's psychologist's opinion conclusive on the question of mental harm. But the Court of Appeals was required by law to view the evidence in the light most favorable to the *prosecution*.

The jury heard a psychologist testify that the girls presented symptoms of anxiety and symptoms of depression. The jury heard from the girls about the petitioner's treatment of them. Destroying school materials, sexually abusing a child, physically abusing a child, threatening a child and forcing a child to suck up urine with her mouth is conduct that could cause mental harm. The jury so concluded, and this court agrees with the Wisconsin Court of Appeals that sufficient evidence supported that conclusion.

4.    Repeated sexual assault of CJ

The jury convicted the petitioner on one count of repeated sexual assault of the same child under Wis. Stat. §948.025(1)(d). The statute requires the state to provide at least three violations of Wis. Stat. §948.02(1), first-degree sexual assault of a child. Here, the state charged the petitioner with three or more violations of Wis. Stat. §948.02(1)(e), which prohibits "sexual contact or sexual intercourse with a person who has not attained the age of 13 years[.]"

The court of appeals noted CJ's testimony that the petitioner made her sleep with him and made her shower with him. Dkt. No. 15-2 at 7. It recounted her testimony that the petitioner would put his butt and "private part" in her face and rub her buttocks and "front private" with a bar of soap. Id. It rejected the petitioner's argument that he sought only to ensure the proper hygiene of his daughter by observing CJ's testimony that the petitioner would walk

31

around the house naked and wave his private part in her face and tell her to put it in her mouth. Id.

The petitioner claims that this conviction cannot stand because CJ's allegations are not believable. He argues that child molesters would not have the restraint to touch a child only with a bar of soap instead of with his fingers and hands. Id. at 12. He argues that a child molester would not have the restraint to only wave his penis in a child's face and not force it into her mouth. Id. He contends that if CJ's allegations were believable, she should have told interviewers about the petitioner getting erections. Id.

Again, the petitioner focuses on the inferences he would have preferred the jury to draw, not a lack of sufficient evidence. The petitioner argues that the jury should not have believed, and this court should not believe, CJ's testimony because of its inconsistencies. But the jury saw CJ testify in person about the events and her interactions with the petitioner. The jury was in the best position to determine whether there were inconsistencies in CJ's testimony, and if so, whether they were enough to render her testimony incredible. The jury appears to have accepted CJ's testimony as credible, despite whatever inconsistencies it may have noted. This court does not have the legal authority to second-guess that determination. This court's task is to determine whether the Wisconsin Court of Appeals made an unreasonable determination in finding that the evidence, viewed in the light most favorable to the convictions, was sufficient for a jury to return a guilty verdict.

The Wisconsin Statutes define "sexual contact" as "(a) Any of the following types of intentional touching, whether direct or through clothing, if that intentional touching is either for the purpose of sexually degrading or sexually humiliating the complainant or sexually arousing or gratifying the defendant." Wis. Stat. §948.01(5)(a)(1). CJ testified that the petitioner made her sleep naked in bed with him. Dkt. No. 29-2 at 59-60. She testified that the petitioner showered with her and touched her buttocks and "front private" with a bar of soap. Id. at 60. CJ testified that the petitioner would walk around naked, wave his penis in her face and tell her to put it in her mouth. Id. at 61-2. Taking this evidence in the light most favorable to the state, the court agrees with the Wisconsin Court of Appeals' conclusion that CJ's testimony was sufficient to allow a reasonably jury to conclude that he made repeated sexual contact with CJ for the purposes of his sexual gratification.

5.      Sexual assault of KS.

Finally, the jury convicted the petitioner on one count of first-degree sexual assault of a child in violation of Wis. Stat. §948.02(1)(e). "Wis. Stat. § 948.02 is Wisconsin's statutory rape law. . . . . There is no intent element with these child sexual assault crimes; they are strict liability crimes." Stern v. Meisner, 812 F.3d 606, 608 (7th Cir. 2016) (citations omitted). "[T]he elements of a violation of Wis. Stat. § 948.02(1)(e) are: (1) defendant had sexual contact with victim; and (2) victim was under 13 years old at time of sexual contact." Id. (citing State v. Badzinski, 352 Wis.2d 329, 337, 342 (2014)).

The court of appeals surveyed KS's interview with the forensic investigator (which the jury viewed):

> K.S. told the forensic interviewer that Riker would "put[] his finger in my front private part and wiggle[] his finger around" when they lived in "[t]he one [the house] we live in right now and the one in [Utah]." When asked, "How are your clothes when that happened at the house you live in now?" K.S. responded, "I probably when it was summer or something I guess. I like to wear pants only." At trial she testified that the assaults at the Wisconsin house occurred "probably . . . not every day. It was probably like a pattern. . . . Like first he did it and then not the other day. Probably the other day, he probably did it at night or morning . . . and any time he felt like it.

Dkt. No. 15-2 at 8. The Wisconsin Court of Appeals found that because the jury could have believed K.S.'s testimony about the sexual assault in Wisconsin without believing that it occurred in the summer, it found the conviction supported by sufficient evidence. Id.

The petitioner and his family moved to Wisconsin from Utah in the fall of 2009—late October or early November. They would not have been in Wisconsin during the summer. The petitioner contends that there wasn't enough evidence for the jury to conclude the behavior KS described happened in Wisconsin, because she referred to summer in describing her clothes. Dkt. No. 33 at 15. He submitted a December 9, 2009 letter, which he argued was written by KS, which states that the sexual assault happened "a year ago." See Dkt. No. 33-3 at 26. The petitioner says that this letter shows KS's trial testimony to be a blatant lie and that no jury could convict him on the basis of her testimony. Id. at 16.

The petitioner does not say whether the state, or his lawyer, presented this letter at trial, and the letter is not referenced during K.S.'s trial testimony.

(On the last page of his reply, the petitioner says "all evidence used in recent filings was used at trial (photos, videos, Colorado paperwork, etc., etc." Dkt. No. 33 at 18. The petitioner does not explain what he means by "recent filings," or identify any specific exhibits or documents.) If this letter was not presented to the jury at trial, the petitioner cannot present it in support of his *habeas* petition. <u>Cullen</u>, 563 U.S. at 182 ("Limiting § 2254(d)(1) review to the state-court record is consistent with our precedents interpreting that statutory provision. Our cases emphasize that review under § 2254(d)(1) focuses on what a state court knew and did."). Even if the letter was part of the trial record, the jury was not required to give it controlling weight over KS's in-court testimony or her video interview. And as the Wisconsin Court of Appeals remarked,

> "Young children cannot be held to an adult's ability to comprehend and recall dates and other specifics." *State v. Fawcett*, 145 Wis. 2d 244, 249, 426 N.W.2d 91 (Ct. App. 1988). Because child sexual abuse "often encompasses a period of time and a pattern of conduct . . . [t]he vagaries of a child's memory more properly go to the credibility of the witness and the weight of the testimony. . . ."

Dkt. No. 15-2 at 8 (quoting <u>Fawcett</u>, 145 Wis. 2d at 254).

As the court has stated repeatedly in this decision, credibility determinations are beyond the scope of review on <u>Jackson</u> claims. <u>Ford</u>, 104 F.3d at 939. The court of appeals was required to view the evidence in the light most favorable to the state and the convictions; it did so, and properly determined that sufficient evidence existed for a rational jury to return a guilty verdict on the first-degree sexual assault charge pertaining to K.S.

6. Excessive Sentence claim

In the "request for relief" section of his petition, the petitioner asked the court to overturn all of his convictions, remand the case for a new trial and "if all else fails, resentencing, as current sentence is outrageously excessive . . . ." Dkt. No. 1 at 18. In his reply brief, he asserts that he did exhaust his excessive sentence claim and refers the court to page 2 of his filing of August 25, 2016. Dkt. No. 33 at 18. Page 2 of the August 25, 2016 filing says that the petitioner is voluntarily dismissing seven of his challenges to his conviction, but that he "reserves the right to challenge the sentence when/if the exhausted nine challenges are remedied in his favor. A resentencing would be in order." Dkt. No. 17 at 2.

The petitioner has not demonstrated that he exhausted his Eighth Amendment excessive sentence claim, but even if he had, he has not made any arguments supporting that claim anywhere in his pleadings. The petition alleges that the sentence is "outrageously excessive." But nowhere in his pleadings has the petitioner discussed the Eighth Amendment standard, or what he would have to prove to state an excessive sentence claim, or why the sentence imposed was excessive given the offenses of conviction. The court has found that it was not unreasonable for the Wisconsin Court of Appeals to determine that sufficient evidence supported convictions on every count, so the petitioner is not eligible for resentencing. Even if he were, however, proving that one's sentence is excessive under the Eighth Amendment is difficult. "The Eighth Amendment does not require strict proportionality between crime and

sentence. Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime." Ewing v. California, 538 U.S. 11, 23 (2003) (quoting Harmelin v. Michigan, 501 U.S. 957, 1001 (1991)). The law governing what constitutes an "extreme" sentence that is "grossly disproportionate" to the crime is complex, and the petitioner has not referenced it or made any argument about why his sentence is extreme or grossly disproportionate.

    C.    Conclusion

The petition does not present any grounds for relief under 28 U.S.C. §2254(d)(1). The court will deny the petition for writ of *habeas corpus.*

## III.  Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. §2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 472, 484 (2000) (internal quotations omitted). The court declines to issue a certificate of appealability, because no reasonable jurist could debate that the petition should be denied.

## IV.    Conclusion

The court **ORDERS** that the petitioner's petition for writ of *habeas corpus* under 28 U.S.C. §2254 is **DENIED**. Dkt. No. 1.

The court **ORDERS** that this case is **DISMISSED**.

The court **DECLINES** to issue a certificate of appealability.

Dated in Milwaukee, Wisconsin this 31st day of December, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**